## The New Orleans Draining Company *v.* De Lizardi et al.

Where a paper signed by a third person, and other acts of his, and hearsay evidence of conversations with him, have been offered in evidence by a party, other statements made by him, though not under oath, and made out of the presence of the party against whom they are offered, are admissible to discredit the writings and statements first introduced.

The action *mandati directa* embraces all claims of the principal against the agent, whether resulting from the execution of the obligation, or for damages for failing to execute it.

Where litigants withhold the evidence by which the nature of their case would be manifested, every presumption to their disadvantage will be adopted.

# 282 SUPREME COURT OF LOUISIANA,

NEW ORLEANS
DRAINING
COMPANY
*v.*
DE LIZARDI.

Where the bailees of securities, entrusted to them for sale, tortiously pledge them, it is an exercise of dominion which amounts to a conversion.

The measure of damages where a written security has been the subject of a tortious conversion, is, ordinarily, the sum recoverable on that security, though the defendant have sold it for less. In the common law courts the plaintiff is entitled to recover, under this rule, the *par* value of the security, with interest only to the day of rendering the verdict, the jury alone being competent to assess the damages, and their verdict being final. In this State, where the damages may be assessed either by the inferior or Supreme Court, interest due on the day of the final judgment is recoverable as part of the damages.

An agent is bound to pay legal interest on any sum belonging to his principal illegally converted to his own use, from the time of its conversion till paid. C. C. 2984.

APPEAL from the Parish Court of New Orleans, *Maurian, J. Soulé* and *Roselius,* for the plaintiffs. *L. Janin, Benjamin* and *Micou,* for the appellants.

' The judgment of the majority of the court was pronounced by

ROST, J. The petition alleges that, on or about the 9th of August, 1836, the plaintiffs made a contract with *M. De Lizardi & Co.,* of New Orleans, by which the Draining Company bound themselves to consign, for sale, to *F. De Lizardi & Co.* of London: 1st, Fifty bonds of the State of Louisiana in favor of the said plaintiffs, bearing five per cent interest, each bond being for one thousand dollars. 2d, Three hundred and sixty bonds also for one thousand dollars each, bearing five per cent interest, drawn by the corporation of the city of New Orleans to the order of said plaintiffs. That the said *M. De Lizardi & Co.* bound themselves to advance to the petitioners in New Orleans, on the consignment of said bonds, in such sums and at such terms as might be required, one hundred thousand dollars, at an interest of five per cent per annum.

That it was also agreed that said bonds should not be sold for less than $104, for each hundred dollars here; and, if they should not be sold at that rate within six months, the plaintiffs would have the right, within the six months thereafter, to withdraw the bonds, or the unsold portion thereof, on paying the capital advanced. That if they did not, *F. De Lizardi & Co.* would, after twelve months from the date of the contract, be authorized to sell at their current value, a sufficient number of the bonds to pay their advances.

The petition further states, the manner in which the proceeds of the bonds and the interest due on them were to be paid, and the commissions allowed to *F. De Lizardi & Co.* It alleges that the bonds were transmitted to *F. De Lizardi & Co.,* according to contract. That, between the years of 1836 and 1839, the said *F. De Lizardi & Co.,* and *M. De Lizardi & Co.* negotiated and sold said bonds, or the greater part thereof, at a premium of four per cent; but instead of advising the plaintiffs of the sale, fraudulently concealed it from them, and in order more effectually to keep the said plaintiffs in ignorance of the transaction, the said *F. De Lizardi* made various wilful misrepresentations, and resorted to various manœuvres and subterfuges, to induce the belief that the bonds were still in their hands, undisposed of. That the said *M. De Lizardi & Co.* aided and abetted in said concealment, and that, amongst other facts, in the beginning of the year 1839, said *F. De Lizardi & Co.* advised them that all the bonds were still in their hands and could not be sold, but proposed to purchase one hundred and twenty-five of them at eighty cents on the dollar, subject to a commission in their favor of two per cent, and payable on time. That the plaintiffs were induced, by that fraudulent misrepresentation and by their pecuniary distress, to accede to that proposition.

That with a view of preventing the plaintiffs from discovering their illegal and fraudulent conduct, the said *F. De Lizardi & Co.* insisted on inserting a clause in the contract, that, in case the Company should find an opportunity of selling the remainder of the bonds, a preference, or rather right of refusal to purchase them, should be given to the said *F. De Lizardi & Co.*, on terms equal to those offered by any other party. That, in the subsequent correspondence between the plaintiffs and *F. De Lizardi & Co.*, the latter always represented the remainder of the bonds as still in their possession, and that the late *Miguel De Lizardi*, the principal partner in the firm of *M. De Lizardi & Co.*, advised, instigated, aided and abetted the said *F. De Lizardi & Co.* in making said misrepresentations and committing said fraud, and participated in the advantages derived therefrom.

That on the 28th of January, 1841, the plaintiffs, still believing that the bonds remained unsold in the possession of their agents, and being much pressed for money, borrowed from *F. De Lizardi & Co.* the sum of $25,000, to be refunded on the 31st December, 1841, at an interest of seven and a half per cent per annum, and one per cent commission. That they were further forced to pledge to the said *F. De Lizardi & Co.*, to secure said loan, fifty of the city bonds, which the lenders represented as being still in their hands; and that, in order to prevent the plaintiffs from detecting the fraudulent deception practised on them, the same right of preference or refusal was again stipulated, at the instance and request of said *F. De Lizardi & Co.*

That the fiscal concerns of the plaintiffs having become desperate by being unjustly deprived of their means, they were compelled, on the 17th of April, 1843, to sell to the said *F. De Lizardi & Co.*, 219 of the remaining bonds at the price of *forty-seven and a half per cent, on certain conditions mentioned in the petition.*

That all those transactions, having originated in fraud and deception on the part of *F. De Lizardi & Co.* and in error on their own, ought to be rescinded and annulled, and all the participators in the fraud be made to pay damages over and above the liability resulting from their agency.

That *Miguel De Lizardi* died on the 20th of September, 1840, leaving as his heirs pure and simple, the widow *Olizabal*, his mother, and his two brothers. That *Francisco De Lizardi* died in March, 1842, leaving as legatees his widow *Helena De Cabas*, and his minor children, all properly represented in New Orleans. That the surviving partner of *F. De Lizardi & Co.* is *Alexander Gordon*, and that the late firm of *M. De Lizardi & Co.* is represented by the widow *Olizabal* and *Manuel Julien De Lizardi.*

The petition prays that the defendants be ordered to render an account of their agency in the sale and negociations of the bonds; that judgment be rendered against them *in solido*, for $440,000, or such other sum as, on a full and fair account and settlement, may appear due to the petitioners, with interest and damages; and that the different contracts and agreements entered into between *F. De Lizardi & Co.* and the petitioners, subsequently to the 9th of August, 1836, be annulled and set aside. The petitioner concludes with a prayer for general relief.

*Alexander Gordon*, the only one of the defendants present at the time of the institution of this suit, filed a separate answer, and denied on oath any knowledge whatever of the sale of the bonds, or of any negociation in relation to them, between the *Marqnis De Casariera* and the firm of *F. De Lizardi &*

NEW ORLEANS
DRAINING
COMPANY
*v.*
DE LIZARDI.

*Co.*, of which he was at that time the managing partner. He denied further, that the plaintiffs had any right of action against him individually.

The answer of the other defendants admits the agency, and the two purchases by *F. De Lizardi & Co.* of the 125 and 219 bonds mentioned in the petition, and avers that the 344 bonds all belong exclusively to the widow and children of *Francisco De Lizardi*, and are now in their possession: That there existed three commercial firms under the names of *Lizardi Hermanos*, *M. De Lizardi & Co.* and *F. De Lizardi & Co.*: The first was established in Paris, and was composed of *Miguel De Lizardi* as head partner, and *Manuel Julien De Lizardi* as junior partner: The second was established in New Orleans, and composed of *Miguel de Lizardi*, as its chief, and of *Edmond T.*, and *Placide Forstall*, as the other partners: The firm of *F. De Lizardi & Co.* was established in London, and was composed of *Francisco De Lizardi* as head partner, and of *Alexander Gordon*, and *Pedro De la Quintano*: That an intimate connexion existed between the several firms, which, on this and many other occasions, acted as agents for each other: That as soon as the bonds mentioned in the petition were sent to the London firm, the New Orleans house commenced making the promised advances: That, in the month of April, 1837, *Miguel De Lizardi* was in Paris; that, not knowing the extent to which advances had been made on the bonds by his house in New Orleans, under the contract of the 9th of August, 1836, and being desirous to re-imburse himself for the advances already made, and provide means for the further advances required by said contract, he took the bonds from the London house for sale in Paris, but could find no purchaser at the limits fixed by the company: That the said firm of *M. De Lizardi & Co.*, being at that time indebted to *Lizardi Hermanos*, who were also expected to provide the funds to be advanced to the Draining Company, the said *Miguel De Lizardi* pledged said bonds to the *Marquis de Casariera*, a capitalist then and still residing in Paris, for a loan made by him to *Lizardi Hermanos*: That notwithstanding said pledge, they had full power to sell the bonds, and attempted in vain to do so: That to reimburse themselves of their advances, they subsequently purchased the bonds, as stated in the petition: That they have since repaid the loan to *Casariera*, and, having the 344 bonds in their possession, now assumed the character of plaintiffs in reconvention. They aver that the plaintiffs, by unjustly aspersing their character, and that of their deceased relatives, and throwing doubts on their title to the bonds, have rendered the sale of them disadvantageous, if not impossible. They, therefore, pray for the recision of the contracts of the 23d of January, 1839, and 17th of April, 1843, and the recovery of the price paid, with interest and damages.

It is in evidence, that, in April, 1843, one *Felipe Mora* came to New Orleans, as agent of his uncle, the *Marqius de Casariera*, and was directed by him to make inquiries in relation to his interests invested in the New Orleans Draining Company. The letter of instructions, bearing date the 25th of February, 1843, contains this passage: " Soy poseedor tambien, mios y de algun otro amigo, de 300 obligaciones de la ciudad de la Nueva Orleans, à favor del Draining Company, de à $1000 cada una, cuyo capital y intereses son tambien pagadores en Londres."

This letter enclosed also the following certificate:

" We, the undersigned, do hereby certify, that, in the year 1837, we sold to the *Marquis de Casariera*, of Paris, a certain amount of bonds of the City of New Orleans, issued in favor of the Draining Company, and endorsed by said

institution ; and we further certify and declare that, we have paid unto the said 
Marquis de Casariera, through the medium of his agent in this city (London),
the dividends which have been made on the said bonds, until the present time;
and that, to the best of our knowledge and belief, the said Marquis de Casariera
is still the owner and proprietor of said bonds, and that he has them at the
present time in his power and possession.  Witness our hands, this 13th day
of February, in the year of our Lord, 1843.

NEW ORLEANS<br>DRAINING<br>COMPANY<br>v.<br>DE LIZARDI.

[Signed,]     F. DE LIZARDI & Co."

Shortly after his arrival, Mora made inquiries of the house of Lanfear & Co.,
in relation to those bonds, and was introduced by them to the Mayor of this
city, who had him introduced to the President of the Draining Company.  Mora
has testified that, in that interview, he simply stated to the president of the
company, that his uncle possessed 300 of the bonds issued by the city, in its
favor.  The person who went with him, and who was present at the conversa-
tion which took place, states, that Mora told the president of the company, that
the Marquis de Casariera was in possession of 300 of the city bonds, issued in
their favor, which he had purchased several years before, of the house of F. D.
Lizardi & Co."

Early in May, the Draining Company dispatched an agent to Paris, for the
purpose of ascertaining from the Marquis de Casariera what amount of bonds
had been sold to him, by whom, at what time, at what rate, and, if possible, of
procuring legal evidence of those transactions.  On the day of his arrival in
Paris, that agent called on Casariera, informed him of the object of his visit,
and had with him, on that day, and on several subsequent occasions, long con-
versations in relation to these bonds.  Casariera made it a condition, before he
would place at the disposal of the company, the evidence that might be in his
possession in relation to the disposal of them, that they must bind themselves
to apply all sums they might recover, to the redemption of the bonds in his
hands.  He stated that if they did not, he would join with the Lizardis in the
defence, if they made it his interest to do so.  The plaintiffs peremptorily
refused that proposal, and upon the information received from their agent, insti-
tuted the present action.

An exception was taken to the introduction of the testimony of this agent, so
far as it related to his conversations with Casariera, on the ground that the acts
and sayings of the witness and Casariera were res inter alios acta, not binding
on the defendants, and that Casariera was a competent witness in the cause.—
That evidence, though originally not admissible, became so in the course of the
trial, to discredit the counter letter, and the other acts of Casariera, and the
hearsay evidence of conversations with that person, introduced by the defend-
ants themselves.  1st Greenleaf's Evid., no. 462.  But we leave it out of view,
except so much of it as goes to prove the degree of diligence used by the plaiytiffs
in search of the witness Casariera, and the answers given to their interrogato-
rios.  1st Greenleaf's Evid., no. 574.

A commission was sent to Paris, to take the deposition of the Marquis de
Casariera; but he positively refused to testify, and frustrated every effort to
compel him so to do.  On the application of the American Minister, at the court
of France, a special order was given by the Minister of Justice, to compel him to
testify.  On that occasion he absconded from Paris, and went en poste to
Boulogne, to avoid yielding obedience to the order of the court.  At another

time, he suffered himself to be fined, rather than appear before the magistrate. The efforts of the American consul, were equally unavailing.

One of the defendants' witnesses states, that he called upon him on their part, and requested him to testify. It has been argued that this witness had been made the dupe of the defendants. Whether he was or not, is not material, under the view we have taken of the rights of the parties.

The cause was tried before a jury, who returned the following verdict:

" We the jury find a verdict in favor of the plaintiffs in the sum $60,000, and and are of opinion that the bonds were pledged."

The judgment rendered upon that verdict was, that the contract for the sale of 125 bonds, executed on the 23d of January. 1839, ·and the contract of the 23d of April, 1843, for the sale of 219 bonds of said city, be annulled, rescinded, set aside, and the bonds returned to the plaintiffs; and that the plaintiffs recover from the defendants the sum of $60,000, with interest from the judicial demand and costs; reserving to the said defendants the right of off-setting any sum which they may have paid on account of the plaintiffs, since the institution of this suit. From this judgment the defendants have appealed.

It would be alike dangerous and unprofitable to go into the inquiry suggested in argument, that the judgment appealed from is inconsistent with the verdict, as the jury understood it. We have authority to pass upon the facts of the case, and to draw our own conclusion from them. If the jury had expressly acquitted the defendants of fraud, and we came to the conclusion that the verdict was contrary to law and evidence, the case would be remanded for trial before another jury. But they have not done so; the verdict in that respect is special, and limited to the finding of the single fact, that the bonds were pledged. The legal inferences from that and the other facts of the case, not concluded by the verdict, fall within the proper province of the court; and, as the plaintiffs have earnestly asked that this litigation be now terminated, we will take of the rights of the parties, as they are placed before us, the only view under which that desirable object can be accomplished, although, in so doing, we are far from being sure that we are adjudicating upon real facts.

The argument that the defendants came into court to answer the charge of selling the bonds and no other, is not tenable, and has not been insisted upon in the second brief of their counsel. Although the petition alleges specially the sale of the bonds, the prayer is sufficiently general to embrace all dispositions, lawful or unlawful, which may have been made of them, and all claims which the plaintiffs may have against the defendants by reason of their agency. This is the action *mandati directa* of the roman law. It embraces all claims of the principal against the agent, whether they be for indebtedness resulting from the execution of the mandate, or for damages sustained by the breach or inexecution of it. See Pothier, Contrat du Mandat, no. 61. Story on Bailments, no. 191.

The evidence in relation to the real nature of the transaction which took place between the defendants and *Casariera*, is so conflicting, and, in part, of so suspicious a character, that the mind gives a reluctant assent to the conclusion to which the jury came, that the bonds had been pledged, and were not sold. We will, however, give the defendants the benefit of the finding of the jury. We will take the facts as stated in argument, that, at a time of great embarrassment, they pledged the bonds to *Casariera*, in April, 1837, as security for a loan made to *Lizardi Hermanos*, the amount of which they have not seen

fit to disclose, and upon which they paid an exorbitantly usurious interest during six years and a half.

Under this view, the case presents the following questions for our consideration:

1st. Could the defendants lawfully pledge the bonds; and, if so, were their subsequent dealings with the plaintiffs, such as to render the pledge lawful, during all the time of its continuance? 2d. If the pledge was at the beginning, or subsequently became, unlawful, how did that circumstance affect the subsequent sales of the bonds made by the plaintiffs to the defendants? 3d. If the pledge was unlawful, was it such an application of the property to a purpose unauthorized by the plaintiffs, as constitutes a conversion; and. if it was, what are the damages which the plaintiffs are entitled to recover?

On the first point, it may be conceded that in England, at the present day, a factor who is entrusted with the possession, either of goods or of documentary titles to goods, may deposit the same by way of pledge for advances made to himself, and that such a contract, when entered into in good faith on the part of the pawnee, in binding on the owner of the goods. That right however, does not exist by virtue of the custom of merchants, but was given by the statute 5 and 6 Victoria, ch. 39, passed in 1842, in derogation of commercial use as previously understood. See Russell on Factors and Brokers, pp. 98, 99; vol. 38, Law Library. It is not easily perceived how a contract of pledge, executed in Paris, could come under the statute of Victoria; but had the pledge been made in England, instead of France, even after the enactment of that statute, although it might have been binding on the plaintiffs, to the amount of the loan between them and the defendants, it would, on the part of the latter, have been tortuous and fraudulent. *Miguel de Lizardi & Co.* had advanced a small sum on account of the $100,000 promised in the contract: but that sum was refunded, long before the expiration of the year during which the loan was to continue, by the sale of the fifty state bonds mentioned in the contract, and of six of the city bonds. At the expiration of the year the defendants were largely indebted to the plaintiffs, and continued to be so till some time in 1841.

If the sum of $100,000, which the defendants were bound to advance to the plaintiffs for one year at an interest of five per cent. was not refunded at the stipulated time, the defendants were authorized to sell, at their market value, a sufficient number of bonds to reimburse themselves. They had no claim for reimbursement until the 26th of August, 1837, and, after that time, in case of nonpayment, the sale of the bonds was their only remedy. It presented no difficulty, as their own brokers have proved that the sale could have been effected, at from 73 to 75 per cent. It would have been much better to make that disposition of them, than to retain them till they fell to 47½ per cent of their par value. The defendants had no color of right either for pledging the bonds, or for suffering that pledge to continue to exist for years afterwards.

We would have been assisted in this inquiry by being informed of the amount borrowed by the defendants on the pledge, and it was incumbent upon them to have shown it; but that fact has been kept concealed from us, although a person, who was at the time an inferior clerk of the Paris house, has, to our surprise, testified to his personal knowledge of all the particulars of the contract of pledge, which the acting partner of *F. De Lizardi & Co.* has sworn were unknown to him. That witness has been careful not to inform us of the amount borrowed. No trace whatever of the transaction is found in the books of any

*Margin note:* NEW ORLEANS DRAINING COMPANY *v.* DE LIZARDI.

of the three firms. It was kept concealed to the last from the plaintiffs, and the correspondence, which is represented as having passed on the subject, between some of the defendants and *Casariera,* as well as the counter-letter adduced in evidence of the pledge, are full of indirection and mystery. If litigants withhold the evidence by which the nature of their case would be manifested, we must adopt every presumption to their disadvantage. We must apply to them the favorite maxim of the law, *omnia præsumuntur contra spoliatores.* See *Armory* v. *Delamirie,* 9th Law Library, 115, and notes.

The defendants received the bonds with the condition that they should not dispose of them at a price less than four per cent over their par value. They sold fifty-six at that limit, and shortly after pledged the remainder as their own, and for their exclusive benefit. We would presume that the sum they borrowed on this unlawful pledge was as large as *Casariera* would lend, if this was not made certain by their own admission that he was to receive, and did receive, during more than six years, in consideration of the loan, the whole amount of the interest stipulated in the bonds.

It is urged, in extenuation of their conduct, that the contract of pledge between them and *Casariera* left them at liberty to sell the bonds; but that faculty was given to them on the condition only, that the entire sum borrowed should be returned, before any of the bonds were delivered. The fact that *Casariera* consented, at one time, to return forty-four of them upon the promise of the payment of a portion of the sum borrowed, if true, shows that, on that occasion, *Casariera* did not insist upon the strict performance of the contract. He was not bound to do so.

The witness already mentioned testifies that, the sum borrowed might have been returned at any time, if it had been necessary to do so. We hold common honesty to be one of the necessities of commerce, and we must believe that it was so considered by the defendants. A moral necessity did exist, independently of all chances to sell the bonds. The defendants must have felt every day, every hour, the necessity of relieving themselves from the weight and disgrace of that unfortunate transaction. The facts that they did not do so until after the institution of this suit, and that they paid usurious interest on the loan during six years and a half, leave no doubt on our minds that, it was utterly out of their power to redeem the pledge, and to sell the bonds as opportunities might offer. It is alleged that they withdrew forty-four of them at one time, and would have withdrawn the remainder, if purchasers had been found. That consequence does not follow; those bonds were returned to them on their express promise to pay back a certain sum, the amount of which is, as usual, not disclosed; but we are left in doubt whether this sum was paid, or whether the bonds were returned to *Casariera.* Indeed the conduct of those parties would justify the belief, that they were in that transaction making evidence for the litigation they must have expected.

To avoid detection they purchased the bonds at long credits, as fast as they could, and reserved, in all their contracts with the plaintiffs, the right to take the bonds unsold at the price that other persons might be willing to give for them. If their embarrassment had continued, and had prevented them from paying *Casariera,* he was authorized by the contract to sell the bonds at any price, whilst the defendants themselves had no authority to sell them under four per cent premium. If the defendants had failed, and the contract of pledge was valid, the bonds would have been sacrificed to pay the loan, and the plaintiffs must have lost them.

It is alleged that, as no sale could be effected at the limit, the circumstance of the bonds being placed in the custody of *Casariera*, instead of remaining in that of *F. De Lizardi & Co.*, has caused the plaintiffs no injury. We are not satisfied that the bonds, or at least a portion of them, could not have been sold at the limit, if the attempt had been seriously made. In the letter from *F. De Lizardi & Co.* to *M. De Lizardi & Co.*, advising the latter of the sale of six of the bonds to *Casariera* at 104, they say; "The prices can be considered only as indicative of our *view of their value*, and we regret to say that this market is not yet in a state to enable us to make progress at these rates." When subsequently they withdrew forty-four of the bonds under the expectation of selling them, they still entertained the same view of their value. In opposition to their own contemporaneous declarations, the evidence of their brokers, taken seven or eight years after those transactions, that the bonds were only worth, at that time, from 73 to 75 per cent, is entitled to little weight, and even those brokers are compelled to say, on the cross-examination, that the bonds in controversy were never offered in the London stock market by them, or to their knowledge. However this may be, the legal rights of the plaintiffs were fixed by the conversion.

If the defendants had sold the bonds under the limit, and subsequently taken them back at half price, the argument that no damage had been sustained by the plaintiff, because no sale could be effected at the limit, would apply with equal force. The rule of damages in cases like this is a question of law; and, beyond the rule, special damages are recoverable, if particularly alleged. 17 Pickg. p. 1. 4 Pickg. p. 466. 2 Greenleaf, Ev. no. 649. Sedgwick on Dam. p. 496.

It is one of the most painful duties of judges, to arraign the motives of suitors and to expose the immorality of their transactions; but, in cases like this, the ends of justice cannot be attained without doing so. We feel constrained to say, that the pledging of the bonds, and the subsequent representations of the defendants, are tainted with deception and fraud, and that the two purchases of bonds made by them during the continuance of the pledge, and under the influence of those representations, must be rescinded and set aside.

The extent of the liability of the defendants remains to be considered; and here it is as well to state that, we consider that liability as joint and several, reserving only to the heirs of *Francisco de Lizardi* and to those of *Miguel de Lizardi*, the benefit of division among themselves. The warranty which one of them has from the others, is a matter to be settled among themselves.

The contract between the plaintiffs and defendants was a bailment of securities, to be sold in England, by *F. de Lizardi & Co.* Those securities were sent by them to France, and there tortiously pledged. This exercise of dominion over them, in defiance of the plaintiffs right, is a conversion. 2 Greenleaf's Evid. no. 642. Russell on Fact. and Book., no. 271, 38 Law Library. 4 Term Reports, 260. *Reynolds* v. *Shuber*, 5 Cowen 323. 7 Johnson, 254. 10 Johnson, 172.

The measure of damages, when a written security has been the subject of the conversion, *is ordinarily the sum recoverable upon that security*, though the defendant may have sold it for a less sum. 2 Greenleaf's Evidence, Nos. 276 and 649, and the cases above cited. In the common law courts the plaintiffs are entitled to recover, under this rule, the par value of the security, with interest down to the day of the rendition of the verdict. 17 Pick. p. 1. Sedgwick on Damages, p. 517, 518. The defendants allege that the bonds have

## 290　SUPREME COURT OF LOUISIANA,

NEW ORLEANS been rendered unsaleable by this controversy, and that they have ceased to be
DRAINING available at any price; but, as the defendants themselves, have forced this con-
COMPANY
*v.* troversy upon the plaintiffs, they cannot be permitted to profit by their own
DE LIZARDI. wrongs. But for those wrongs the bonds would probably now be an available
security for their nominal amount, and there is no reason why they should not
again become so, when this litigation is ended.

The liability for interest is limited, in other States, to the time of the verdict,
because, at common law, the jury is alone competent to assess the damages,
and the verdict is final; it is otherwise with us. The damages may be assessed
equally well by the court in the first instance, or, as in this case, by the appell-
ate court; and the plain import and reason of the rule, under our forms of
practice, is, that all interest recoverable on the day of the final judgment, forms
part of them.

The defendants have shown that they have paid *Casariera*, in consideration
of the loan he made them, the whole interest due on the face of the bonds,
until the month of October, 1843, at which time they prove that the bonds
were returned to them; they allege in their answer that they have them now
in their possession, and pray to be allowed to return them, on being refunded
the price paid. If the bonds, or part of them, had been tendered by the
defendants and accepted by the plaintiffs, that restoration would have gone in
mitigation of damages, and have placed the defendants in a much more favor-
able situation; but this has not been done, and the plaintiffs, instead of asking
the restoration of the securities, claim damages for the unauthorized disposition
of them. They are entitled to those damages; but equity requires that the
interest, which the defendants are liable to pay from the time of the conversion
to that of the final judgment, be considered as compensated by that, which, un_
der other circumstances, might have been recoverable upon the bonds for the
same period of time, leaving the bonds in the hands of the defendants free from
all interest that has heretofore accrued on them. The defendants must ac-
count, as of this day, for the par value of 344 bonds, and also for the sums
charged in their accounts for dividends of interest on the 219 bonds purchased
by *F. De Lizardi & Co.*, for the interest charged on those sums, and for the
commissions allowed them on the sales of those bonds. They must be credited
with all sums really advanced to the plaintiffs before the judicial demand, with
the interest agreed upon, from the date of those advances to the present time,
and with all other commissions charged in their accounts, reserving their right
to recover subsequent advances. This will leave, on this day, in favor of the
plaintiffs, a balance of $182,704 19, for which they are entitled to a judg-
ment with legal interest from this date till paid. ˙ Civil Code, art. 2984.

It is therefore ordered that the judgment in this case be reversed, and, pro-
ceeding to give such a judgment as should have been given in the court below,
it is further ordered, that the plaintiffs recover from the defendants *in solido,*
but with the benefit of division between the heirs of *Miguel,* and *Francisco de
Lizardi* among themselves respectively, the sum of $182,704 19 ; with
interest at the rate of five per cent per annum from this day till paid, and the
costs of the court below; those of this appeal to be paid by the plaintiffs and
appellees.

It is further ordered, that the interest that has heretofore accrued on the
three hundred and forty-four bonds in the hands of the defendants, be com-
pensated with the interest which they are liable to pay by reason of the
conversion of said bonds.

It is further ordered that the contract for the sale of 125 bonds, executed on the 23d January, 1839, and the contract of the 23d April, 1843, for the sale of 219 bonds, be annulled, rescinded and set aside.

It is finally ordered that the rights of the defendants, on account of advances made by them to the plaintiffs since the judicial demand, and also for all interest hereafter to accrue on the bonds in their hands, be reserved.

Eustis, C. J., dissenting. Not having been able to come to the same conclusion as to the facts which this singular case presents, which my brethren have thought themselves bound to adopt, it is incumbent on me to give the reason for my opinion, which I will comprize in as short a space as possible. The defendants have endeavored to establish that the bonds in question were pledged and not sold to *Casariera*, and the verdict of the jury, which was in favor of the plaintiffs for $60,000, is qualified by the *opinion, that the bonds were pledged*.

There are certain facts connected with this defence, which have satisfied me that it has no foundation in truth:

I. We have a formal certificate, under the hand of the London house, *F. de Lizardi & Co.*, attested by two witnesses, that the bonds were sold to *Casariera*, in the year 1837. It is attempted to weaken the effect of this instrument by limiting it to the six bonds bought by *Casariera*, but its meaning is too clear. It evidently relates to the bonds in the possession of *Casariera*, at the time of the certificate. Else why is this clause appended to the certificate—" and we further certify and declare, that we have paid unto the said *Marquis de Casariera*, through the medium of his agents in this city, *the dividends which have made on said bonds*, until the present time, and that, to the best of our knowledge and belief, the said *Marquis de Casariera is still the owner and proprietor of said bonds*, and that he has them at the present time in his power and possession."

II. If the bonds were pledged to *Casariera* for a loan, even the amount of which we are left to conjecture, its duration, and the onerous terms on which it was said to be contracted, necessarily imply that the lender should have some security for its reimbursement. Whether we test the validity of this pledge by our own laws, or those of France, as we have the means of ascertaining them, the security of *Casariera* was not worth the paper on which it was written. Against third persons and creditors of the defendants, *Casariera* could not have retained one of these bonds for an instant The delivery of the bonds, as stated in the counter letter of the 24th April, 1837, and the letter addressed to *Casariera* of the same date, gave him no privilege on the bonds, nor any means of protecting himself from loss, in the event of a breach of trust, accident, or insolvency of the *Lizardis*, That a man, such as *Casariera* is represented to be by the defendants themselves, would have loaned so large a sum, for such a length of time, without security, under the circumstances represented, I cannot believe, and I therefore dissent from the *opinion* of the jury, that the bonds were pledged, and adhere to the opinion of the defendants themselves, given in their certificate of the 13th Feb., 1843, that, in the year 1837, they sold them to *Casariera*.

III. It has been thought material to aver and place on record, that one of the two partners of the house of *F. de Lizardi & Co.* of London, and an active member of that firm, had no knowledge whatever of the transactions with *Casariera*.

NEW ORLEANS
DRAINING
COMPANY
*v.*
DE LIZARDI.

IV. It appears that there is no trace of this transaction on the books of either the London or Paris house. What reason can be assigned for this omission ?

I have reluctantly come to the conclusion that the whole affair was a stock-jobbing operation between the *Lizardis* and *Casariera*, which they dared not avow, and of which the instinct of self preservation induced them to leave no record. Although the *Lizardis* sold the bonds to *Casariera*, it by no means follows that he bought them for himself. He was also a banker ; he had friends, probably customers at a distance, as the *Lizardis* had—" *Soy poseedor tambien, mios y de algun otro amigo*, de 300 obligaciones," says *Casariera* to his nephew, in his letter of the 25th Feb., 1843.

I think the plaintiffs' case is fully made out. A clearer case of fraud is rarely presented to a court of justice. The conduct of the parties throughout is indefensible, and without palliation or apology.

As to the amount for which the defendants are liable to the plaintiffs, I acquiesce in the opinion of my brethren.